## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### *Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. 1:21-cr-200-CMH |
| ONYEWUCHI IBEH, | **Sentencing**: November 4, 2022 |
| *Defendant*. | |

## POSITION OF THE UNITED STATES
## <u>WITH RESPECT TO SENTENCING</u>

After a three-day trial, a jury convicted defendant Onyewuchi Ibeh of eleven counts of money laundering. The Court ordered a Presentence Investigation Report which found the advisory Guidelines range to be 151 to 188 months. The United States agrees with this Guidelines calculation. After careful consideration of the statutory factors, the United States recommends that the Court: (1) sentence Ibeh to a term of incarceration within the applicable guideline range; (2) impose a term of supervised release; (3) order restitution to the identified victims in this case; (4) impose a forfeiture money judgment representing a conservative calculation of the profits of the scheme that Ibeh personally derived; and (5) order an $1,100 special assessment.  Such a sentence would be sufficient but not greater than necessary to accomplish Section 3553(a)'s sentencing objectives.

### *Factual Background*

### I.      **The Underlying Business Email Compromise Scheme**

For years, Ibeh ran a sophisticated operation that laundered the proceeds of a business email compromise scheme. In a business email compromise scheme, a conspirator first gains

1

access to a company's email system. Then, the conspirator lies in wait and observes how the company conducts its business. When a payment to or from the company is due, the conspirator inserts themselves into email conversations between the business partners and impersonates employees of those businesses. The conspirator—pretending to be the business partner—changes the payment information and redirects the payment to a bank account controlled by the conspiracy. Ibeh operated a network of bank accounts that received the money from the defrauded businesses.

Law enforcement began investigating this criminal activity after receiving a complaint from a Boston-based company called Fundamental Media in January 2019. PSR ¶ 23. As the President of Fundamental testified at trial, fraudsters misdirected over $350,000 of Fundamental's money to a bank account controlled by Ibeh. *Id*. Over the next few years, law enforcement identified at least two dozen victim businesses from across the world. PSR ¶ 18. These victims varied in size, industry, and level of sophistication. PSR ¶ 18. But each told a variation of the same story: someone tricked them into sending money to a bank account opened in the Washington, D.C. metro area. *Id*. These companies rarely recovered this money, and they struggled to fill the gap left by the lost income. What's more, these companies often incurred additional costs to investigate the compromise and bolster their email systems.

## II.     Ibeh Starts Laundering the Proceeds of Fraud

Though Ibeh evolved his money laundering organization over time, the general structure remained the same.

### A.  The First-Level Accounts

When the money left the victim's account, it was usually directed to a first-level account, usually at Wells Fargo. PSR ¶ 19. Ibeh recruited people to open business bank accounts at Wells

2

Fargo in the names of newly formed sole proprietorships. PSR ¶ 19. These "businesses" were textbook shell companies that conducted no legitimate business before or after the fraudulent transactions. *Id*. Chate'a Thomas opened one of these first-level accounts and, at trial, described how Ibeh's coconspirators recruited her into the scheme. Trial Tr. vol. 1, 51-87. Lured in with promises that someone would invest in her fledgling business, Thomas opened an account at Wells Fargo. *Id*. By the time she realized her account would be used for fraud, she had already handed over control of her account to a person she later learned was Ibeh. *Id*. When she questioned how Ibeh was using the account, he threatened to pull back his "investment":



GX-204. Thomas acquiesced. Her account received money, transferred that money out, and was closed by Wells Fargo.

This was typical since Wells Fargo often received a wire recall request from the victim business or its bank. *E.g.*, Trial Tr. vol. 1, 152:18-153:2. These wire recalls caused Wells Fargo to open an investigation. Trial Tr. vol. 1, 51:3-24. Using common recipients, IP addresses, and methods of operation, Wells Fargo discovered a network of fraudulent accounts belonging to 36

3

separate customers. Trial Tr. vol. 1, 52-53. Approximately $13 million of victim funds passed

through these accounts. Trial Tr. vol. 1, 51:17-19.

     *B.  The Second-Level Accounts*

     Shortly after it arrived, the victim's money left the first-level accounts for second-level

accounts. PSR ¶ 19. Ibeh personally operated many of the second-level accounts, despite other

people opening them. *See, e.g.*, Trial Tr. vol. 2, 29:22-30:13 (O'Sullivan describing Ibeh's access

of accounts in other's names). From the second-level accounts, chunks of the fraudulent

proceeds were transferred overseas. The remainder Ibeh spent and used to pay his

coconspirators. *See* GX-209 (Ayeah admitting Ibeh paid him for his role in the conspiracy).

     On July 14, 2016, Ibeh opened a second level account at Bank of America. GX-401.

Ibeh's convicted coconspirator Mouaaz Elkhebri used his position as an employee of Bank of

America to open this account. *Id*. About a month later, this account received over $40,000 in

deposits via Wells Fargo. Within days, much of this money was depleted via international wire

transfers and cash withdrawals. Of the money not transferred overseas, Ibeh spent much of it at

restaurants, bars, and clubs. At no point did this bank account show anything resembling

legitimate business activity. This pattern continued for years with more and more victim money

ending up in Ibeh's account.

     In April 2017, Ibeh convinced Jason Joyner to open up a second-level account at Bank of

America in the name of Joyner Fabric. GX-401. Like Ibeh's BOA-0479 account, Joyner's BOA-

6930 account saw no legitimate business activity yet received hundreds of thousands of dollars

from fraud victims. GX-404. Joyner withdrew this money in cash and hand-delivered it to Ibeh.

*Id*.

### III.     Ibeh Recruits Others to Expand His Money Laundering Operation

In February 2018, Bank of America shut down Ibeh and Joyner's accounts on suspicion of fraud. *Id.* This did not stop Ibeh's money laundering operation. Far from it, Ibeh soon recruited Elkhebri and Anthony Ayeah (another convicted coconspirator) to open up second-level accounts at Bank of America in the name of their fictional businesses. PSR ¶ 29. Ibeh also instructed Joyner to open another second-level account at TD Bank. GX-501. Like the other second-level accounts, Joyner's TD account also received large amounts of victim money. GX-502.

As Ibeh's money laundering operation grew, so did his expenditures. In addition to spending thousands of dollars a month at bars and clubs, Ibeh began buying expensive, custom jewelry. For instance, days after laundering over $300,000 belonging to Fundamental, Ibeh put a $10,000 down payment on a diamond pendant bearing his resemblance:



GX-217.

## IV.   Law Enforcement Charges and Convicted Ibeh and his Coconspirators

On August 11, 2021, law enforcement arrested Ibeh, Joyner, Ayeah, and Elkhebri on a criminal complaint. PSR ¶ 1. After his arrest, Ibeh talked to law enforcement about his involvement in the criminal scheme. GX-1. Among other things, Ibeh noted that he realized the illegal nature of his activity. *Id*. To date, this is the closest Ibeh has ever come to accepting responsibility. PSR ¶ 41.

On November 16, 2021, Ayeah pled guilty to conspiracy to commit money laundering and the Court sentenced him to 15 months in prison. PSR ¶ 16. Two weeks later, Elkhebri also pled guilty to conspiracy to commit money laundering and received the same sentence. PSR ¶ 15. On February 10, 2022, Ibeh and Joyner were indicted and charged with various forms of money laundering. PSR ¶ 8. On August 10, 2022, a jury found Ibeh guilty of all 11 counts against him. PSR ¶ 11.

### *Legal Standard*

The standards governing this Court's sentencing are well established. This Court must consult the Guidelines as well as the factors set forth in 18 U.S.C. § 3553(a) when making a sentencing decision, though the Guidelines are purely advisory. *See United States v. Booker*, 543 U.S. 220 (2005). The Supreme Court has directed district courts to "begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). "Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Section 3553(a) sets out a variety of factors that the Court should consider in determining the defendant's sentence,

6

including the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," among others. 18 U.S.C. § 3553(a)(1)-(2)(A) & (B).

*Application*

## I. Sentencing Guidelines Calculation

The PSR found, and the United States agrees, that Ibeh's Guidelines range is as follows:

| | | |
|---|---|---|
| Base Offense Level | | 26 |
| Adjustments | | |
| | Defendant was in the business of money laundering | +4 |
| | Role in the offense | +4 |
| **Total Offense Level** | | **34** |

*See* PSR ¶¶ 32-42. Ibeh's criminal history is Category I. PSR ¶ 47; U.S.S.G. §§ 4A1.1, 4A1.2. Based on Ibeh's adjusted offense level of 34 and criminal history of Category I, the advisory Guidelines range is 151 to 188 months. PSR ¶ 67; U.S.S.G. § 5A.

## II. The Guidelines Calculated Correctly.

### A. *Ibeh should be held responsible for the entire loss amount because, as leader of the criminal conspiracy, he could foresee the consequences of others' actions.*

Probation properly calculated the loss amount here. In money laundering cases, the loss equals the value of the laundered funds. U.S.S.G. §2S1.1 n. 1. Here, as discussed in Postal Inspector O'Sullivan's Declaration, at least $3.8 million from at least 24 victims passed through Ibeh's network of accounts. The unrefuted evidence at trial puts the loss at over $13 million. Trial Tr. vol. 1, 51:17-19. Of this number, the United States excluded victim money that passed

7

through accounts for which the United States did not have records. Then, the United States further culled out money from companies not immediately identifiable as victims. What was left came out to just over $3.8 million in laundered funds. And because Ibeh and his conspirators did not use these accounts to conduct legitimate business, the $3.8 million likely understates the loss.

*Second*, as the leader of the conspiracy, the Court should hold Ibeh responsible for the entire amount attributable to the conspiracy. The Guidelines define relevant conduct to include all acts of others that were "(i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3. The Fourth Circuit has routinely held that "members of a conspiracy or scheme to defraud can be held responsible at sentencing for the entire foreseeable loss caused by the conspiracy or scheme." *United States v. Abdulla*, 632 F. App'x 98, 101 (4th Cir. 2015). This is especially true where the defendant was the leader of a criminal conspiracy. *See United States v. Shulman*, 107 F.3d 868 (4th Cir. 1997) (holding defendant responsible for entire loss amount because, as CEO and President, defendant "had knowledge of exactly what was going on").

The movement of money through layers of accounts falls within the scope of the money laundering enterprise. This movement furthered the criminal activity and in fact comprised the criminal activity itself. Ibeh personally conducted many transactions and directed many more. By doing so, Ibeh could reasonably foresee the criminal consequences of those actions. For these reasons, the Court should hold Ibeh responsible for the conspiracy's entire loss amount.

8

B.  *Ibeh was a professional money launderer because his money laundering profits comprised almost all of his substantial income.*

Section 2S1.1 lists six factors courts should consider when determining whether a defendant was in the business of money laundering: (1) whether the defendant regularly engaged in laundering funds; (2) whether the laundering lasted an extended period of time; (3) whether the defendant laundered funds from multiple sources; (4) whether defendant generated a substantial amount of revenue for laundering funds; (5) whether the defendant had prior money laundering convictions; and (6) whether the defendant made statements about the conduct described above. U.S.S.G. § 2S1.1 n. 4(B). The balance of these factors weighs in favor of finding Ibeh engaged in a money laundering business. The United States has identified at least 24 victims of whose money Ibeh laundered. This money passed through his accounts regularly during the five-year conspiracy for which the jury convicted Ibeh. Taken together, these facts tilt the first three factors heavily in favor of including this enhancement.

As for the fourth factor, Ibeh appears to have derived almost all of his income from his money laundering operation. Ibeh reported no income on his tax returns between 2018 and 2020. GX-723; Trial Tr. vol. 2, 39:17-25. Furthermore, Ibeh's personal bank accounts show no direct deposits or other indicators of legitimate business activity. GX-506. Despite this lack of income, Ibeh led a lavish lifestyle full of luxury apartments, parties, and custom jewelry. Ibeh funded his lifestyle using the proceeds of fraud. *See, e.g.*, GX-405 (showing no deposits other than the money stolen from Fundamental and laundered by Ibeh). Because Ibeh's only discernable income came from his money laundering business, the Court should conclude that a substantial amount of revenue came from laundering funds.

9

Even though the fifth and sixth factors do not apply, the first four counsel in favor of applying the enhancement. Accordingly, the Court should overrule Ibeh's objection and find that Ibeh was engaged in the business of money laundering.

### C. Ibeh ran and organized an extensive criminal enterprise.

To apply the four-level enhancement to Ibeh for his role in the offense, the Court must find that Ibeh was an organizer or leader and the criminal activity involved at least 5 participants. U.S.S.G. § 3B1.1(a). Both elements are met here.

To start, Ibeh clearly organized and led the criminal activity. In determining whether a defendant acted as a leader or organizer, courts should consider, among other things: (1) the exercise of decision-making authority, (2) the recruitment of accomplices, (3) the claimed right to a larger share of the fruits of the crime, (4) the degree of participation in planning or organizing the offense, and (5) the degree of control and authority exercised over others. U.S.S.G. § 3B1.1 n. 4. The record here demonstrates Ibeh meets these criteria. Ibeh recruited multiple people into the scheme, including Ayeah, Elkhebri, and Joyner. PSR ¶ 29; GX-209; GX-2. Elkhebri and Ayeah both stated that Ibeh kept the majority of the profits, and the records support this. Ibeh knew when fraudulent proceeds would arrive in the accounts, evidencing his participation in planning and organizing the offense. GX-201 (Ibeh's brother states—days before Fundamental was defrauded—that he heard the money was coming soon). And Ibeh controlled an array of accounts opened by others through which shows his control and authority over others. *See, e.g.*, Trial Tr. vol. 1, 78-80 (Thomas explaining that she gave the username, password, and debit card to Ibeh's coconspirator). Taken together, these facts paint Ibeh as the unquestioned leader and organizer of the money laundering scheme.

10

As for the second element, the criminal activity involved well over five participants. Counting only the four people convicted for this crime (Ibeh, Joyner, Ayeah, and Elkhebri) and Chate'a Thomas, who testified to her involvement under oath, the Court can conclude this criminal activity was extensive. Dozens of people also participated by opening first-level accounts that received victim funds, further demonstrating the extensive nature of this criminal scheme. Trial Tr. vol. 1, 51:3-16 (Wells Fargo investigator noting at least 36 people opened accounts linked to the criminal scheme). In sum, Ibeh led an extensive criminal organization, and the Court should apply the four-level enhancement.

## III.   Statutory Analysis of the Section 3553(a) Factors

Based on the circumstances of this case and a careful review of the § 3553 factors, the United States recommends that the Court: (1) sentence Ibeh to 151 to 188 months in prison; (2) impose a one-year term of supervised release; and (3) order restitution in the amount of $3,800,969.52.

### A.   The recommended sentence is necessary based on the nature, circumstances, and seriousness of the offense.

The nature and circumstances of Ibeh's offense call for a substantial term of imprisonment. Ibeh played an active and integral role in a long-running criminal enterprise. Ibeh's actions caused considerable harm to foreign and domestic businesses. Once defrauded, these companies tried to recover their money but could not because of Ibeh's actions. By moving the money quickly through the U.S. banking system and transferring it overseas, Ibeh ensured the fraudsters could keep the proceeds of their fraud.

Ibeh did not take these actions because he was facing some acute economic distress like a lost job. Nor did he turn to crime to support a large number of dependents. Rather, Ibeh chose to

11

launder millions of dollars for one reason: greed. Ibeh saw that he could make money by moving money through bank accounts. And he did just that for years.

Ibeh also tried to skirt accountability. In his own words, Ibeh "stepped back" to avoid detection and in the process, used others to shield himself from the consequences of his action. GX-1. Ibeh's organization recruited dozens of people to open the first-level accounts that were most likely to face scrutiny. Ibeh even used his own brother to put more distance between himself and the recruits opening the first level accounts. *See generally* GX-201 (coconspirator references his brother throughout and relaying instructions to Thomas).

When Bank of America closed Ibeh's own second-level account, he used Elkhebri and Ayeah to open accounts for him. Ibeh could not risk appearing on camera withdrawing the fraud proceeds in cash, so he paid Joyner to do it for him. And Ibeh did not want his online transactions to tie back to him, so he used his girlfriend to subscribe to the internet where he conducted his criminal transactions. GX-806; GX-807; GX-808.

Together, these facts illustrate the seriousness of Ibeh's conduct and his efforts to escape accountability. The nature and circumstances of this conduct demand a meaningful term of imprisonment.

   *B.  The recommended sentence is necessary to provide general and specific deterrence.*

The Court should impose a substantial term of imprisonment to deter Ibeh and others from similar conduct. Ibeh continued his criminal activity in spite of the many indicators that what he was doing was unlawful. *See, e.g.*, GX-301 through 310 (showing repeated account closures for fraud). Given the lengthy period of criminality, Ibeh's actions reflect a profound lack of respect for the rule of law. The recommended sentence would address that lack of respect and deter Ibeh from future criminal conduct.

Likewise, the Court should impose a sentence that would deter others from engaging in similar, criminal conduct. Congress fashioned the money laundering statutes to deter criminals from using their fraudulent proceeds to support a luxurious lifestyle and to slow the growth of criminal enterprises. *United States v. Santos*, 553 U.S. 507, 536 (2008) (citing Model Act, Policy Statement, at C–105). Money launderers like Ibeh provide an indispensable service necessary to facilitate criminal activity. 31 Am. Crim. L. Rev. 721, 722 ("without the ability to move and hide its enormous wealth through laundering techniques, large scale criminal activity could operate only at a small fraction of current levels, and with far less flexibility"). Deterring money launders also serves to deter the enterprises whose crimes launders facilitate. The United States respectfully urges the Court to impose a sentence that will stand as a rebuke to Ibeh's lawlessness and deter others who would otherwise engage in similar conduct.

C. *The recommended sentence is necessary to avoid unwarranted sentencing disparities.*

Congress has directed this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The recommended sentence does just that. As the leader of this conspiracy, Ibeh is significantly more culpable than his convicted coconspirators. The crimes his coconspirators committed could not have occurred absent Ibeh's direction. Moreover, unlike Ayeah and Elkhebri, Ibeh has never accepted responsibility for his role in the scheme.

Ibeh's involvement was also much more widespread than any of his coconspirators. While Ayeah and Elkhebri accessed one or two accounts, Ibeh accessed many more. GX-806 through 808; GX-410A. Ibeh's conduct was much more widespread, lasting at least 5 years compared to about a year for Ayeah and Elkhebri.

13

Ibeh also profited much more than his coconspirators. They struggled financially as Ibeh kept the bulk of the profits and led a life of luxury. Ibeh laundered multiples of the amount his coconspirators laundered and received multiples more in compensation. This greater culpability should yield a greater sentence. In sum, these facts paint Ibeh as much more culpable and, as such, much more deserving of a lengthy prison sentence.

### *Conclusion*

For the reasons stated above, the United States respectfully recommends the Court: (1) sentence Ibeh to (1) sentence Ibeh to prison within the applicable guideline range; (2) impose the maximum term of supervised release; (3) order restitution; (4) enter a forfeiture money judgment; and (5) order a special assessment of $1,100.

Respectfully submitted,

Jessica D. Aber
United States Attorney

October 27, 2022          By:  _____/s/_____

Christopher J. Hood, *Assistant U.S. Attorney*
Russell L. Carlberg, *Assistant U.S. Attorney*
Elizabeth M. Bagwell, *Special Assistant U.S. Attorney*
United States Attorney's Office
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-2700

14

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2022, I caused a copy of the foregoing memorandum to be filed with the Clerk of Court using the CM/ECF system, which will automatically generate a Notice of Electronic Filing (NEF) to all counsel of record. I will also send a copy to the United States Probation Officer.

Russell L. Carlberg
Assistant United States Attorney